# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY PLUMMER,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>NANCY A. BERRYHILL[1],<br>Acting Commissioner of Social Security,<br><br>　　　　Defendant. | Case No.: 1:16-cv-01137 - JLT<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF MARY PLUMMER AND AGAINST DEFENDANT NANCY BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY |

Mary Plummer asserts she is entitled to benefits under Titles II and XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the record and seeks judicial review of the decision to deny her application for benefits. Because the ALJ failed to apply the proper legal standards in evaluating the record, Plaintiff's motion for summary judgment is **GRANTED** and the decision is **REMANDED** for further proceedings.

## **PROCEDURAL HISTORY**

Plaintiff filed an application for a period of disability and disability insurance benefits on November 5, 2012, and supplemental security income on April 11, 2013. (Doc. 12-6 at 2, 9) In both applications, Plaintiff alleged disability beginning in December 2011. (*Id.*) The Social Security

---

[1] Nancy A. Berryhill is now Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, as the defendant in this suit.

1

Administration denied her applications at the initial level and upon reconsideration. (*See generally* Doc. 12-4 at 2-46; Doc. 12-3 at 13) After requesting a hearing, Plaintiff testified before an ALJ on January 14, 2015. (Doc. 12-3 at 13) The ALJ determined Plaintiff was not disabled and issued an order denying benefits on March 24, 2015. (*Id.* at 13-21) When the Appeals Council denied Plaintiff's request for review on June 8, 2016 (*id.* at 2-4), the ALJ's findings became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## **ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.     Medical Background and Opinions**

Plaintiff "was involved in a significant motor vehicle accident" in the 1970s, when she was 21 years old, after which she "had issues with her cervical spine as well as her lower back." (Doc. 12-8 at 8) Plaintiff was involved in another motor vehicle accident on December 22, 2010, which caused "increasing pain of her neck." (*Id.*)

On January 29, 2011, Plaintiff underwent an MRI of her cervical spine. (Doc. 12-8 at 9) The MRI showed "degenerative changes of multiple levels… from C2, C3 to C7, T1." (*Id.*) Plaintiff also had "mild to moderate disk loss of height [and] mild disk bulge." (*Id.*) There was "[n]o cord compression or nerve compression." (*Id.*)

Dr. Jon Park performed "a new patient evaluation" on Plaintiff at a neurosurgery spine clinic on February 21, 2011. (Doc. 12-8 at 8) Dr. Park noted Plaintiff had "suffered multiple injuries, including a left hip replacement as well as a right kneecap replacement" in 1973. (*Id.* at 8, 9) In addition, Plaintiff had "a left foot drop since that time." (*Id.* at 8) Following the second car accident, Plaintiff described having "a left greater than right-sided neck pain," as well as "lower back pain that is mild to moderate without any radiating symptoms," though her neck pain was improving. (*Id.*) Dr. Park

3

observed that Plaintiff had a "good" range of motion and was "able to rotate from right to left, up and down without any issues." (*Id.* at 9) He found Plaintiff had "severe muscle spasms" and was "tender upon palpation." (*Id.*) Dr. Park opined Plaintiff "most likely suffered a whiplash injury in which she would benefit from a muscle relaxant." (*Id.* at 10) In addition, he advised Plaintiff to "undergo physical therapy and massage therapy to reduce her severe spasm." (*Id.*) Dr. Park concluded surgery was not necessary to treat Plaintiff's neck and back. (*Id.*)

In December 2011, Plaintiff visited the office of Loreen Ketels Flaherty, a podiatrist, complaining "of a pain to the entire left ankle, particularly anteriorly and medially," which was an 8/10 in intensity. (Doc. 12-9 at 3) Dr. Flaherty observed that Plaintiff's left "foot does clear the ground with ambulation, but sits in a metatarsus adductus attitude." (*Id.*) Dr. Flaherty reviewed x-rays of Plaintiff's left ankle and found "joint thinning, spurring, [and] arthritic changes." (*Id.*) She opined Plaintiff's epicritic sensation was intact, but her "[v]ibratory sensation [was] decreased due to nerve damage." (*Id.*) Plaintiff exhibited pain upon palpation to her ankle. (*Id.*) Dr. Flaherty diagnosed Plaintiff with osteoarthritis, Achilles tendonitis, tibial tendonitis, and pain in her limb. (*Id.*) She administered a cortisone injection into Plaintiff's ankle and prescribed ankle support. (*Id.*)

Due to Plaintiff's reports of constant pain in her left knee, she was referred to Dr. Paramjeet Gill for a consultative orthopedic examination that occurred on December 20, 2011. (Doc. 12-9 at 42) She described her pain "as aching and shooting" and explained that it was moderate to severe in intensity. (*Id.*) Dr. Gill also noted Plaintiff reported she "was working doing sales but her company just went out of business [that] week." (*Id.*) Dr. Gill observed Plaintiff had a normal gait on the right side, but an antalgic gait on the left. (*Id.* at 43) Her left knee had "mild varus" alignment, moderate swelling, and abnormal strength. (*Id.*) In addition, an x-ray taken that day showed "[s]evere osteoarthritic changes [in the] left knee." (*Id.*) Dr. Gill opined Plaintiff's treatment options included viscosupplement injections and total knee replacement surgery, and Plaintiff agreed to schedule the surgery. (*Id*)

On January 31, 2012, Dr. William Holvik examined Plaintiff prior to a scheduled knee surgery. (Doc. 12-8 at 34) Plaintiff had a full range of motion "without pain" in her neck. (*Id.*) Dr. Holvik opined Plaintiff had an "adequate" range of motion in her back, stable gait, and normal strength. (*Id.*) He found "no joint tenderness or effusion." (*Id.*) He recommended Plaintiff "[s]tart [an] exercise

program once [her] knee recovered." (*Id.* at 35)

Dr. Gill performed a "left total knee arthroplasty" on February 6, 2012. (Doc. 12-8 at 55, 63) He noted Plaintiff was expected to remain in the hospital for "1 to 2 days." (*Id.* at 67) Following the surgery, Plaintiff "used a walker for 1 week," which was followed by using a cane for one week. (*Id.* at 45) In addition, Plaintiff took pain medication for three weeks and reported that her pain was "controlled by [the] narcotics when taken daily." (*Id.* at 46)

On March 6, 2012, Plaintiff visited Dr. Flaherty and continued to complain of pain in her left ankle, which she described as an 8/10 in intensity. (Doc. 12-9 at 5) Dr. Flaherty observed that Plaintiff was "breaking through" her ankle support and "order[ed] a donjoy brace to replace it." (*Id.*) She noted Plaintiff was recovering from her knee replacement surgery and "wishe[d] to wait a year for ankle surgery." (*Id.*) Dr. Flaherty believed a donjoy brace would "stabilize her and stop pain until then." (*Id.*) Plaintiff received the custom-molded brace ten days later. (*Id.* at 7)

Dr. Gill performed a post-operative examination on March 27, 2012, and found the wound was "well healed" without signs of infection. (Doc. 12-8 at 45) Plaintiff told Dr. Gill that the recovery on her knee was "much quicker" than she experienced with her right knee replacement, and she was "pleased with the current postoperative status." (*Id.*) Dr. Gill directed Plaintiff to "continue physical therapy protocol, active and passive [range of motion], strengthening and stretching." (*Id.*)

On April 5, 2012, Plaintiff returned to Dr. Flaherty, reporting "the donjoy brace cannot be tolerated." (Doc. 12-9 at 8) However, Plaintiff said the cortisone injection helped with her pain. (*Id.*) Dr. Flaherty noted Plaintiff wanted "to continue minimal [weight] bearing, look for a job, and [return] for a []2nd cortisone injection." (*Id.*) On April 25, Dr. Flaherty noted Plaintiff did not identify any "significant improvement since the last visit." (*Id.* at 9) In May, Plaintiff continued to report pain that was 8/10 in intensity. (*Id.* at 10) Dr. Flaherty administered a second cortisone injection on May 30, 2012. (*Id.* at 10, 12)

In August 2012, Dr. Flaherty noted that Plaintiff had "chronic ankle ensethopathy on the left that she wears a couple of braces for." (Doc. 12-9 at 12, 28) She observed Plaintiff also had "arthritis in [her ankle], continuous degeneration, and pain." (*Id.*) Dr. Flaherty administered a third cortisone shot on August 29. (*Id.*)

Dr. Flaherty examined Plaintiff on December 14, 2012, noting Plaintiff "again [had] chronic ankle enthesopathy in the left [foot]." (Doc. 12-9 at 30) In addition, she opined Plaintiff had "severe arthritis with degeneration and pain in the ankle joint and sinus tarsi." (*Id.*) Plaintiff continued to have "erythema, edema, and pain to palpation with movement of the ankle." (*Id.*) Dr. Flaherty found the cortisone shots "help significantly especially when they are put in the sinus tarsi," and administered another injection. (*Id.*) She noted Plaintiff could "come in every 4-5 months" for an injection. (*Id.*)

Dr. Dale Van Kirk performed a comprehensive orthopedic evaluation on December 30, 2012. (Doc. 12-9 at 33) Plaintiff reported that she worked "for 35 years," and identified "[t]he main physical reason why she [was] not gainfully employed… [was] chronic back pain with radiation down the left leg, as well as left ankle pain." (*Id.* at 33-34) She said she "use[d] an ankle brace for stability," and estimated she could "stand, walk and sit for about one-half hour." (*Id.* at 34) Dr. Van Kirk observed that Plaintiff had a dropfoot on the left, and noted "getting up on [her] heels is impossible on the left side." (*Id.* at 35) When asked to squat, Plaintiff went "about one-third of the way down but could not continue because of back pain." (*Id.*) Dr. Van Kirk found Plaintiff's motor strength was "normal, 5/5, in the upper extremities and lower extremities bilaterally, except dorsiflexion of the left ankle [was] minimal, estimated at 1+/5." (*Id.*) Plaintiff could "barely move" her toes and ankle on the left. (*Id.*) Dr. Van Kirk concluded Plaintiff "should use her ankle brace for stability on the left side mainly when she is out and about for even and uneven terrain" and "should be able to stand and/or walk cumulatively for six hours out of an eight-hour day." (*Id.* at 37) In addition, he believed Plaintiff "should be able to lift and carry frequently 10 pounds and occasionally 20 pounds, limited because of chronic pain in the back as well as chronic pain in the left ankle." (*Id.*) Further, Dr. Van Kirk opined Plaintiff was "limited to only occasional postural activities including bending, stooping, crouching, climbing, kneeling, balancing, crawling, pushing and pulling." (*Id.*) Because Plaintiff reported her symptoms increased with cold weather, Dr. Van Kirk concluded that "she should not be required to work in an extremely cold and/or damp environment." (*Id.*)

Plaintiff had images taken of her lumbar and cervical spine in January 2013. (Doc. 12-9 at 40, 42-44) Dr. Lee Schratter determined Plaintiff had degenerative changes at several levels in the cervical spine, including "[m]ild to moderate" disc desiccation, loss of disc height, disc bulges, and neural

foraminal narrowing. (*Id.* at 42) Reviewing images of the lumbar spine, Dr. Richard Clutson opined Plaintiff had "[m]ild disc space narrowing … at L3-L4 with mild anterior bony osteophytosis consistent with early change of degenerative disc disease," as well as "[m]inimal anterior sublaxation of L3 on L4." (*Id.* at 40, 44) Dr. Clutson also found "[m]inimal anterior degenerative endplate bony osteophytosis" at the T12-L1 level. (*Id.*)

In March 2013, Plaintiff sought treatment for migraines, aching joints, and pain in her back and ankle. (Doc. 12-9 at 52) She reported she was having difficulty sitting and standing. (*Id.*) Plaintiff received prescriptions for Norco and Gabapentin. (*Id.*) At an appointment two weeks later, Plaintiff was advised to rest, elevate her foot, and apply compression to her ankle. (*Id.* at 51)

Plaintiff continued to complain of back and neck pain in April 2013, which she described as both "sharp" and "dull" in the lower lumbar spine. (Doc. 12-9 at 50) She rated the pain as a "9/10" in intensity but said with Norco her pain decreased to a "4-5." (*Id.*) Plaintiff was diagnosed with lumbar and cervical disc bulges with radiculopathy, and a nerve conduction test was recommended. (*Id.*)

Plaintiff sought to establish care with the Family Healthcare Network in June 2013. (Doc. 12-10 at 16) Michael Ellison, PA-C, observed that Plaintiff and an "[a]bnormal movement of extremities," including a "slight limp when walking." (*Id.* at 17) Plaintiff reported her pain was a "4," and she was taking Gabapentin, Lopressor, Norco, and Sumatriptan. (*Id.* at 16-17) Mr. Ellison requested x-rays of Plaintiff's left ankle, which showed "degenerative change with spur formation and narrowing of the ankle joint," "soft tissue swelling," and "degenerative arthritis of the tarsometatarsal joints." (*Id.* at 9)

In July 2013, Plaintiff described her pain as a "6" and requested a referral to see Dr. Flaherty for a steroid injection. (Doc. 12-10 at 6-7) Mr. Ellison referred Plaintiff to Dr. Flaherty as requested. (*Id.* at 7)

Plaintiff reported she had right knee pain in September 2013, and said it felt like it was "clicking" for a couple of weeks. (Doc. 12-10 at 28) She told Mr. Ellison that she had an "occasional sensation that [her] knee will give way," and it was swelling occasionally. (*Id.*) Mr. Ellison found Plaintiff had a "slightly decreased" range of motion and exhibited mild tenderness to palpation.

In October 2013, Dr. Flaherty observed that Plaintiff had an antalgic gait with "[a]ny sort of weight-bearing." (Doc. 12-10 at 23, 33) She also had "generalized swelling in the ankle with a lack of

7

dorsiflexion, a lack of eversion, inversion, and pain." (*Id.*) Reviewing x-rays of Plaintiff's ankle, Dr. Flaherty found Plaintiff had "severe osteoarthritis in the ankle joint with almost no ankle joint left." (*Id.*) Dr. Flaherty administered a cortisone shot and directed Plaintiff to return in six months. (*Id.*)

In December 2013, Plaintiff reported that she was experiencing constant ringing in her ears. (Doc. 12-10 at 34) Mr. Ellison diagnosed Plaintiff with tinnitus and gave Plaintiff a referral for an audiogram. (*Id.*)

Plaintiff continued to complain of ringing in her ears in February 2014, reporting she also had decreased hearing in her right ear. (Doc. 12-10 at 36) Plaintiff requested a refill of hydrocodone for her knee and ankle pain, reporting she was "almost out" of the medication. (*Id.*) Mr. Ellison refilled the prescription as requested and referred Plaintiff "urgently" to audiology and an ENT for further evaluation. (*Id.* at 37)

Dr. Ronald Wong performed an audiogram, and concluded Plaintiff had "[a]bnormal results." (Doc. 12-11 at 3) According to Dr. Wong, Plaintiff the audiogram showed "bilateral high frequency hearing loss." (*Id.*)

In September 2014, Plaintiff told Mr. Ellison that she was having difficulty sitting, because if she sat "for 10 minutes, [she] had numbness in bilateral 4th and 5th fingers and forearms." (Doc. 12-10 at 44) She had a "slightly decreased" range of motion in the cervical spine, and "slight" tenderness upon palpation. (*Id.* at 45) Mr. Ellison ordered additional imaging due to numbness Plaintiff said she experienced. (*Id.*) Reviewing the x-rays of Plaintiff's cervical spine taken on September 15, Dr. Aaron Berkley determined Plaintiff had "advanced facet arthropathy" in the C3 and C4 facet joints, and "severe disc space narrowing in the C5-6 and C6-7 levels." (*Id.* at 47) An x-ray of Plaintiff's lumbar spine showed "advanced disc space narrowing as well as advanced facet arthropathy." (*Id.* at 48)

In October 2014, Plaintiff had MRIs taken of her cervical and lumbar spines. (Doc. 12-10 at 24-25) Dr. Richard Anderson determined Plaintiff's cervical spine was "essentially unchanged from the previous exam" in January 2011. (*Id.* at 24) Specifically, he found Plaintiff had "[s]cattered degenerative changes with anterior hypertropic spurring at the C5-6, C6-7 and T2-3 levels," as well as "[c]hronic degeneration" of the C5-6, C6-7 and T2-3 discs." (*Id.*) He opined there was "narrowing of both disc spaces" at the C6-5 and C6-7 levels, with "bulging of the disc annulus at each level,

producing mild encroachment upon the central spinal encroachment upon the central spinal canal and mild spinal stenosis." (*Id.*) Reviewing the images of Plaintiff's lumbar spine, Dr. Anderson found "[s]cattered mild degenerative changes" and "[m]inimal posterior bulging of the T-12 disc annulus, producing only slight encroachment upon the central spinal canal." (*Id.* at 25) Dr. Anderson also found "[f]acet and ligamentum flavum hypertrophy produce posterolateral encroachment upon the central spinal canal and mild spinal stenosis at the L3-4 and L4-5 levels." (*Id.*)

On November 13, 2014, Dr. Flaherty administered another cortisone injection to treat Plaintiff's left ankle pain. (Doc. 12-11 at 47) Dr. Flaherty noted Plaintiff reported "an unusual stabbing pain in the ankle, pointing to the sinus tarsi area and lateral ankle." (*Id.*) She described the pain as an "8/10" in intensity, reporting she had this level of pain "after periods of rest." (*Id.*) Dr. Flaherty determined Plaintiff's neurological examination results were normal, with the exception of vibratory sensation, which was "decreased due to nerve damage." (*Id.*) Plaintiff also exhibited pain upon palpation to the ankle joint. (*Id.*) Dr. Flaherty referred Plaintiff to Dr. Derek Florek for a surgical consultation "for a possible fusion." (*Id.* at 47)

Dr. Flaherty completed a residual functional capacity questionnaire on December 4, 2014. (Doc. 12-11 at 49) Dr. Flaherty noted Plaintiff's x-rays showed "joint narrowing, degeneration, [and] spurring." (*Id.*) Dr. Flaherty believed Plaintiff's prognosis was "poor," though surgery could possibly decrease Plaintiff's pain and increase her mobility. (*Id.*) Dr. Flaherty opined Plaintiff's pain was "constantly" severe enough to interfere with her ability to sustain attention and concentration for even simple work tasks. (*Id.* at 59) In addition, Dr. Flaherty believed Plaintiff "would unable to perform" routine, repetitive tasks at a consistent pace; detailed or complicated tasks; fast-paced tasks, such as a production line; or positions requiring exposure to work hazards, such as heights or moving machinery. (*Id.*) According to Dr. Flaherty, Plaintiff could sit for ten minutes at one time and about two hours total in an eight-hour day, stand about five minutes at one time and less than two hours in an eight-hour day, and must be able to shift positions at will, including walking for two minutes about every ten minutes. (*Id.* at 51) Dr. Flaherty indicated Plaintiff needed to elevate her legs above her waist about 20 percent of the day. (*Id.* at 52) Dr. Flaherty opined Plaintiff could never lift more than ten pounds; rarely twist; and never stoop, crouch, squat, or climb. (*Id.*)

| | |
|---|---|
| 1 | Plaintiff had an electromyographic examination and nerve conduction study on January 29, |
| 2 | 2015. (Doc. 12-11 at 64) Dr. Frank Lagattuta determined Plaintiff had "mild carpal tunnel syndrome |
| 3 | on the right side" and determined Plaintiff should wear a night brace. (*Id.* at 64-65) |

### B.  Administrative Hearing Testimony

Plaintiff testified that she was in a car accident with a drunk driver in 1973, in which she "went over a cliff" and "spent two months in the hospital." (Doc. 12-3 at 41-42) Plaintiff said her vertebras were injured, she broke her pelvic bone in both places, broke both knees, and had nerve damage down her left leg that caused a drop foot. (*Id.* at 42) Plaintiff stated she was "paying for it, and had her left hip replaced as well as both knees. (*Id.*) She also reported she had "horrible pain between [her] shoulders" and her arms fell asleep. (*Id.*) Further, Plaintiff said "all the muscle left the ankle," and her doctor wanted to perform a replacement." (*Id.*)

She said that she last worked in 2011 doing sales calls for Valley Voice Newspaper. (Doc. 12-3 at 38) She reported she "took off to have [her] knee replaced," and "while [she] was out on disability, they closed the business down." (*Id.* at 39) Plaintiff explained she was on disability for a year following her knee surgery, because she then had problems with her ankle. (*Id.* at 35)

Plaintiff believed that was unable to work because if she sat too long, her ankle would swell and her "left leg and both … arms fall asleep." (Doc. 12-3 at 42-43) Plaintiff reported that when she got up to move, the pain in her ankle was "so bad" that it would bring her to tears. (*Id.* at 43) In addition, Plaintiff said her left hip ached like she was "driving it into the ground" if she was on it too long. (*Id.* at 44) She testified that walking made her worry that her right knee was "going to twist and break" if she went "a little bit crooked," because it felt as though her knee was moving around oddly." (*Id.* at 43)

She stated she was advised to use a walker but did not want to do so "yet" because "when you start using those things, all your other muscles go." (Doc. 12-3 at 51-52, 65) In addition, Plaintiff was told to elevate her foot and said she did so "every couple hours" each day, for ten to fifteen minutes at a time. (*Id.* at 57) She stated that every couple of hours she also placed an ice pack on her neck and a heating pad on her lower back. (*Id.* at 62-63)

Plaintiff said she was "pretty strong in [her] upper body," so she was able to lift "10 or 15

pounds," but she was unable to walk with that weight. (Doc. 12-3 at 62) She believed she was unable to carry more than five pounds—the weight of her purse—due to the pressure on her ankle, left leg, and lower back. (*Id.*)

**C.  The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of December 14, 2011. (Doc. 12-3 at 15) At step two, the ALJ found Plaintiff's severe impairments included: "degenerative disc disease of the cervical and lumbar spine, osteoarthritis of the left ankle joint." (*Id.*) At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing. (*Id.* at 16) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform light work as described in 20 CFR 404.1567(b) and 416.967(b) except occasionally claimant can lift and/or carry 20 pounds and 10 pounds frequently. Claimant can stand and/or walk 6 hours in an 8-hour workday with normal breaks. Additionally, claimant can sit 6 hours in an 8-hour workday with normal breaks. Occasionally claimant can use her left lower extremity for use of foot controls. Claimant can use ankle/foot orthotic for prolonged ambulation and ambulation over uneven terrain. Occasionally claimant can climb ramps and/or stairs; climb ropes, ladders, and scaffolds; balanc[e]; stoop; kneel; crouch; and crawl. Claimant should avoid concentrated exposure to extreme cold and wetness.

(*Id.* at 16) Based upon this RFC, the ALJ concluded Plaintiff was "capable of performing past relevant work as a sales manager (DOT 163.167-018, sedentary, SVP8) and outside sales (DOT 254.35-014, light, SVP6)." (*Id.* at 20) Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 21)

## DISCUSSION AND ANALYSIS

Appealing the decision to deny her application for benefits, Plaintiff asserts the ALJ failed to discuss her hearing testimony and improperly evaluated the credibility of her subjective complaints. (Doc. 16 at 25-38) In addition, Plaintiff alleges the ALJ erred in evaluating the medical record. (*Id.* at 38-50) On the other hand, Defendant argues that "[t]he Commissioner's final decision should be affirmed because it is supported by substantial evidence and free of legal error." (Doc. 18 at 15)

**A.  ALJ's Credibility Analysis**

In evaluating credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other

symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Where the objective medical evidence shows an underlying impairment, and there is no affirmative evidence of a claimant's malingering, an "adverse credibility finding must be based on clear and convincing reasons." *Id.* at 1036; *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). Here, the ALJ determined Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Doc. 12-3 at 20) However, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible . . . ." (*Id.*) Thus, the ALJ was required to set forth clear and convincing reasons to support the adverse credibility determination.

### 1. Failure to address hearing testimony

As an initial matter, to evaluate a claimant's residual function capacity, the ALJ "must consider all relevant evidence in the record, including, . . . medical records, lay evidence, and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (internal quotations omitted); *see also Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001) ("[l]ay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony"). Thus, an ALJ has a burden to address a claimant's hearing testimony.

The ALJ failed to discuss— or even acknowledge—Plaintiff's testimony at the administrative hearing. Instead, the ALJ addresses only statements that Plaintiff made in her disability report and questionnaires completed in the course of her application, noting:

> The claimant alleges disability due to migraines, left foot drop and ankle issues (Exhibit 4E, p. 2). She notes she walks, shops and can lift 20 pounds but not carry 20 pounds. She drives, but it is painful to her back and ankle (Exhibit 6E, p. 4). She reported degenerative arthritis in her low and mid back that cause pain while sitting, standing, and walking. She reported a knee replacement that caused more pain and arthritis, as well as drop foot and welling. She notes she can run errands with a can, stand 5 minutes, sit ½ hour, and walking or standing hurts her back and ankle (Exhibit 12E). She reported that her sciatic and left leg and ankle were worse on reconsideration (Exhibit 15E)

(Doc. 12-3 at 17; *see also* Doc. 12-7 at 15-25 [Exh. 4E], 44-46 [Exh. 6E], 64-66 [Exh. 12E], 72-77 [Exh. 15E])

Significantly, at the hearing in January 14, 2015—more than fifteen months after she last

completed one of the questionnaires to which the ALJ referred in his summary of her complaints—Plaintiff testified regarding her physical abilities, stating she could lift 10 or 15 pounds but carry no more than 5 pounds. (Doc. 12-13 at 62) In addition, Plaintiff reported that she was advised to use a walker but did not want to do so "yet" because "when you start using those things, all your other muscles go." (*Id.* at 51-52, 65) Plaintiff also said that she was told to elevate her foot, and said she did so "every couple hours" each day, for ten to fifteen minutes at a time. (*Id.* at 57) Further, Plaintiff said she was unable to work because if she sat too long, her ankle would swell and her "left leg and both … arms fall asleep." (*Id.* at 42-43) However, the ALJ failed to address this testimony, or provide reasons for ignoring the limitations identified by Plaintiff during the hearing. Consequently, the ALJ failed to address relevant evidence in the record and erred in his analysis. *See Robbins*, 466 F.3d at 883; *Lewis*, 236 F.3d at 511; *see also Shimotsu ex rel. Shimotsu v. Colvin,* 2016 U.S. Dist. LEXIS 56886 (C.D. Cal. Apr. 27, 2016) (finding error where "the ALJ failed to acknowledge Plaintiff's hearing testimony, let alone provide reasons for disregarding it").

### 2. Credibility factors considered by the ALJ

To the extent the ALJ purported to find Plaintiff lacked credibility due to her statements in the disability report and questionnaires identified above, the credibility analysis is also flawed. Factors that may be considered by an ALJ in assessing a claimant's credibility include, but are not limited to: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct, (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment, and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). Here, the ALJ considered the objective medical record, the treatment received, and Plaintiff's work history. (Doc. 12-3 at 20)

#### a. Objective medical record

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Commissioner of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999).

The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis"). Because the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in determining Plaintiff's credibility.

Importantly, if an ALJ cites the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to simply state that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Rather, an ALJ must "specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ must identify "what evidence suggests the complaints are not credible"). Here, the ALJ failed to identify the portions of Plaintiff's testimony—as well as statements in the questionnaires—that he believed were inconsistent with the medical record. Rather, the ALJ provided only a summary of the entirety of the medical record. (*See* Doc. 12-3 at 17-20)

As the Ninth Circuit explained, a "summariz[ing] the medical evidence supporting [the] RFC determination… is not the sort of explanation or the kind of 'specific reasons' [the Court] must have in order to … ensure that the claimant's testimony was not arbitrarily discredited." *See, e.g., Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015). As a result, "the observations an ALJ makes as part of the summary of the medical record are not sufficient to establish clear and convincing reasons for rejecting a Plaintiff's credibility." *Argueta v. Colvin*, 2016 U.S. Dist. LEXIS 102007 at *44 (E.D. Cal. Aug. 3, 2016).

In *Brown-Hunter*, the claimant argued the ALJ failed to provide clear and convincing reasons for rejecting her symptom testimony. *Id.*, 806 F. 3d at 491. The district court identified inconsistences in the ALJ's summary of the medical record that it gave rise to reasonable inferences about Plaintiff's

14

credibility. *Id.* On appeal, the Ninth Circuit determined the ALJ failed to identify the testimony she found not credible, and did not link that testimony to support the adverse credibility determination. *Id.* at 493. The Court explained that even if the district court's analysis was sound, the analysis could not cure the ALJ's failure. *Id.* at 494. Likewise, here, the ALJ offered no more than a summary of the medical evidence, and he did not identify the statements of Plaintiff that he believed conflicted with this record. Although Defendant identifies inconsistencies between Plaintiff's testimony and the medical records summarized by the ALJ (*see* Doc. 18 at 7-8), these inconsistencies cannot support the adverse credibility determination because the Court is "constrained to *review* the reasons the *ALJ* asserts." *Brown-Hunter*, 806 F.3d at 494 (emphasis in original) (quoting *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).

Given the ALJ's failure to "specifically identify what testimony is credible and what evidence undermines the claimant's complaints," the objective medical record fails to support the adverse credibility determination. *See Greger*, 464 F.3d at 972; *Brown-Hunter*, 806 F.3d at 494.

    *b.*  *Treatment received*

In assessing a claimant's credibility, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. § 404.1529(c). In addition, the treatment received, especially when conservative, is a legitimate consideration in a credibility finding. *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) ("[e]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment"); *see also Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's failure to prescribe, and the claimant's failure to request, medical treatment commensurate with the "supposedly excruciating pain" alleged).

The ALJ observed, "Although the claimant has received various forms of treatment for the allegedly disabling symptoms, which would normally weigh somewhat in the claimant's favor, the record also reveals that treatment has been generally successful in controlling those symptoms." (Doc. 12-3 at 20) However, the ALJ fails to identify any evidence supporting this conclusion. Moreover, the ALJ appears to erroneously equate "control" with "functionality" and the ability to sustain work. *See e.g., Lule v. Berryhill*, 2017 U.S. Dist. LEXIS 19392, at *18 (E.D. Cal. Feb. 9, 2017) (finding the ALJ

erred in evaluating the record because the stability of a condition alone does not support a conclusion that the claimant is "able to perform work for an eight-hour day"). Consequently, the Court is unable to find the treatment Plaintiff received is a clear and convincing reason to find she lacks credibility.

### c. Plaintiff's work history

"An ALJ is required to consider work history when assessing credibility." *Matthews v. Berryhill*, 2017 WL 3383118 at *12 (E.D. Cal. Aug. 7, 2017) (citing 20 C.F.R. § 404.1529(c)(3) and Social Security Ruling 96-7p, 1996 SSR LEXIS 4). "Evidence of a poor work history that suggests a claimant is not motivated to work is a proper reason to discredit a claimant's testimony that he is unable to work." *Franz v. Colvin*, 91 F.Supp.3d 1200, 1209 (D. Or. 2015) (citing *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002)); *see also Albidrez v. Astrue*, 504 F.Supp.2d 814, 822 (C.D. Cal. 2007) ("[a]n ALJ may properly consider a claimant's poor or nonexistent work history in making a negative credibility determination").

In this case, the ALJ noted:

> There is evidence that the claimant stopped working for reasons not related to the allegedly disabling impairments. On December 20, 2011, the claimant reported she was working doing sales, but her company went out of business. (Exhibit 5F, p. 4). Further, there is no evidence of a significant deterioration in the claimant's medical condition since that layoff. A reasonable inference, therefore, is that the claimant's impairments would not prevent the performance of that job, since it was being performed adequately at the time of the layoff despite a similar medical condition.

(Doc. 12-3 at 20) Plaintiff contends the ALJ's "underlying assumption and his inference were both faulty" and do not support an adverse credibility determination. (Doc. 16 at 31-32)

As Plaintiff observes, the evidence cited by the ALJ is a treatment note that Plaintiff "was doing sales but her company just went out of business this week." (Doc. 16 at 32, quoting Doc. 12-9 at 42) At the hearing, Plaintiff explained she was *not* working when the company went out of business, and was, in fact, "out on disability" to have her knee surgery when the business was closed. (Doc. 12-3 at 38-39) In addition, she reported that she was disabled for a year following that surgery. (*Id.* at 35) Moreover, Plaintiff testified regarding the worsening of her conditions, including having her leg and arms fall asleep and the recommendation of using a walker for assistance. (*See id.* at 42-43, 51) Thus, the record does not support the ALJ's statements that Plaintiff's job was "performed adequately" at the time of the layoff, or that the record lacked evidence of deterioration.

16

Finally, it is unclear how Plaintiff's work history or candor over losing her job while on disability undermines the credibility of her subjective complaints—namely, that she is no longer able to work due to pain in her level of pain. *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1038 (9th Cir. 2007) (a claimant's work history does not support an adverse credibility determination if the claimant "experience[d] pain and limitations severe enough to preclude him from maintaining substantial gainful employment").

### 3. Conclusion

The ALJ failed to properly set forth findings "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 958. The ALJ's failure to specifically discuss and identify what portions of Plaintiff's testimony he found not credible also constituted a failure to apply the correct legal standards in evaluating the credibility of Plaintiff's testimony. As a result, the reasons for rejecting Plaintiff's credibility cannot be upheld by the Court.

## B. Remand is Appropriate

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988). The Ninth Circuit explained that "where the ALJ improperly rejects the claimant's testimony regarding his limitations, and the claimant would be disabled if his testimony were credited," the testimony can be

credited as true, and remand is not appropriate. *Lester*, 81 F.3d at 834.

Importantly, courts retain flexibility in crediting testimony as true, and a remand for further proceedings regarding the credibility of a claimant is an appropriate remedy. *See, e.g., Bunnell*, 947 F.2d at 348 (affirming the district court's order remanding for further proceedings where the ALJ failed to explain with sufficient specificity the basis for rejecting the claimant's testimony); *Byrnes v. Shalala*, 60 F.3d 639, 642 (9th Cir. 1995) (remanding the case "for further proceedings evaluating the credibility of [the claimant's] subjective complaints . . ."). Here, the findings of the ALJ are insufficient to determine whether Plaintiff's statements should be credited as true. Consequently, the matter should be remanded for the ALJ to re-evaluate the evidence.

## CONCLUSION AND ORDER

For the reasons set forth above, the Court finds the ALJ failed to apply the proper legal standards in evaluating Plaintiff's credibility, and administrative decision should not be upheld. *See Sanchez*, 812 F.2d at 510. Because remand is appropriate for further proceedings, the Court offers no findings related the remaining issue identified in Plaintiff's opening brief. Accordingly, the Court **ORDERS**:

1. Plaintiff's motion for summary judgment (Doc. 16) is **GRANTED;**
2. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
3. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Mary Plummer and against Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **February 21, 2018**        /s/ Jennifer L. Thurston
                            UNITED STATES MAGISTRATE JUDGE